**LAWRENCE CARTY, et al., Plaintiffs**
**v.**
**ROY L. SCHNEIDER, M.D., et al., Defendants**

Civ. No. 94-78

District Court of the Virgin Islands

Div. of St. Thomas and St. John

November 26, 1997

Benjamin Currence, Esq., St. Thomas, U.S.V.I., *for Plaintiffs*

Marjorie Rifkin, Esq., (American Civil Liberties Union Foundation), Washington, D.C., *for Plaintiffs*

Gina Harrison, Esq. (Office of the Attorney General of the Virgin Islands, Department of Justice), St. Thomas, U.S.V.I., *Special Counsel to the Attorney General*

Hon. Julio A. Brady, (Attorney General of Virgin Islands, Department of Justice), St. Thomas, U.S.V.I., *for Defendants*

BROTMAN, *Judge*

## OPINION ON SANCTIONS FOR CIVIL CONTEMPT

Presently before the court is the sanctions component of civil contempt proceedings. On January 29, 1997, this court found the defendants in the above-captioned matter in contempt of court orders relating to a Settlement Agreement entered into by the parties in October 1994 to remedy unconstitutional conditions at the Criminal Justice Complex (CJC) in St. Thomas, United States Virgin Islands. Plaintiffs have requested, inter alia, that this court fine the defendants for their non-compliance with the Settlement Agreement and court orders enforcing same.[1] After holding an evidentiary hearing on sanctions on April 1, 1997 in St. Thomas and upon consideration of the parties' submissions and the reports from the Special Master in this matter, the court herein concludes for the present time the sanctions phase of the contempt proceedings.

## I. Introduction

In its comprehensive Opinion of January 29, 1997, this court catalogued the nature and extent of the unconstitutional conditions of confinement at the CJC. The court need not recount here the unseemly and, indeed, shocking details that justified its findings that, in almost all respects, the defendants not only had violated CJC inmates' constitutional rights but also had ignored the terms of the Settlement Agreement to which they had agreed. By the latter action, the defendants violated court orders; thus, this court held the defendants in civil contempt. *Carty v. Farrelly,* 35 V.I. 400, 957 F. Supp. 727, 745, 748 (D.C.V.I. 1997).

To lend context to the subsequent discussion of sanctions, the court will recapitulate briefly the contours of the Settlement Agreement and the defendants' failure to comply with its terms. Such backdrop will help illustrate the progress, if any, defendants have made in remedying the severe and complex problems that they face at the CJC.

---

[1] Plaintiffs also request that the court (1) order the release of each CJC prisoner who is within one year of his maximum release date; (2) enjoin defendants from admitting to the CJC pre-trial detainees whose bail is set at less than $5,000 or who have been charged only with violation of immigration laws, and (3) require the defendants to establish a twelve-bed psychiatric unit at the Roy L. Schneider Hospital in St. Thomas for purposes of treating mentally ill CJC inmates.

## II. The Settlement Agreement and Defendants' Non-Compliance

In June 1994, a group of pretrial detainees and sentenced inmates confined in the CJC filed a class action Complaint and Motion for Preliminary Injunction challenging alleged unconstitutional, inhumane, and dangerous conditions of confinement at the CJC. Plaintiffs requested, inter alia, that the court close the facility due to extreme overcrowding which, in conjunction with other factors, created the unconstitutional conditions of which plaintiffs complained.

In October 1994, the parties entered into the previously referenced Settlement Agreement (hereinafter "Agreement"), also referred to as the "Consent Decree." The terms of the Agreement obligate the defendants to achieve compliance with minimal constitutional standards within a specific time frame. The Agreement categorizes the problematic conditions so as to facilitate compliance; similarly, this court's subsequent findings in *Carty v. Farrelly* corresponded to the various categories set forth in the Agreement.[2] In specific, this court found that the defendants consistently had failed to remedy the unconstitutional conditions in every category outlined in the Agreement except "Mail, Telephone, and Visitation." More important for purposes of the present discussion, this court found the defendants in contempt of the October 17, 1995 court order to enforce the Agreement:[3]

> At present [(in January 1997)], the CJC population remains excessively high; thus, the facility remains exceedingly overcrowded. . . . The conditions of confinement at the CJC also continue to fall far short of very basic, minimum habitability. More important . . . , defendants have not made adequate efforts to remedy the critical

---

[2] The guidelines in the Agreement govern (1) Population, (2) Shelter, Physical Plant, and Environmental Health, (3) Fire Safety, (4) Medical Care, (5) Mental Health, (6) Corrections and Security, (7) Compliance with the Americans with Disabilities Act, (8) Religious Freedom, (9) Legal Access, (10) Mail, Telephone, and Visitation, and (11) Miscellaneous Provisions regarding expansion of the CJC.

[3] That order required defendants to comply with the terms of the Agreement, to achieve a population reduction at the CJC, and to raise substandard conditions of confinement to a constitutional minimum.

issues they must face, both under orders of the court and according to the agreement to which they bound themselves.

*Id.* 957 F. Supp. at 743.

## III. Defendants' Post-contempt Actions

■ Once holding a party in contempt of court for failure to comply with a court order, the court must afford the contemnor an opportunity to purge himself of the contempt. *United Mine Workers of America v. Bagwell,* 512 U.S. 821, 114 S. Ct. 2552, 2558, 129 L. Ed. 2d 642 (1994). Similarly, evidence of good faith may affect the court's calculation of contempt sanctions. *Harley-Davidson, Inc. v. Morris,* 19 F.3d 142, 148 (3d Cir. 1994). In the present case, the defendants have been afforded many opportunities to comply with court orders to remedy the conditions of confinement at the CJC. Certainly they have had the opportunity to "purge" the contempt through compliance since this court's January 29, 1997 Opinion and Order. Indeed, the extent to which they have done so will inform the amount and type of sanctions this court will impose.

### A. The April 1, 1997 Hearing on Sanctions

To the extent that, at the time of the court's opinion and order of January 29, 1997, the defendants had not stated a position as to the amount and type of sanctions the court should apply, the court afforded notice and an additional opportunity for the defendants to respond to the court's findings and plaintiffs' request for sanctions at a hearing in St. Thomas, U.S.V.I. on April 1, 1997. At that hearing, plaintiffs reiterated their call for a host of sanctions, citing defendants' intransigence over a period of two and a half years in failing to meet a two-year-old deadline for compliance with the terms of the Agreement. The defendants, in turn, acknowledged their noncompliance and, as on past occasions, blamed their inaction on a "severe financial crisis" of the Virgin Islands government.

At the hearing, Attorney General Brady—a named defendant—reported to the court that the defendants were in the process of devising a "short-term action plan" in an effort to comply with the terms of the Agreement. In specific, the Attorney General outlined

five government initiatives aimed at reducing the CJC population and improving the conditions of confinement. First, the Attorney General's office would coordinate with the United States Attorney's office to review on a periodic basis the status of pre-trial detainees awaiting trial in an effort to release certain eligible prisoners from incarceration. Second, the government would work toward improving the physical structure of the prison and the halfway house by soliciting specialists and contractors to estimate the cost of needed repairs; as of April 1, 1997, however, there was no funding to implement any proposed changes or to pay any contractor. Third, the Attorney General would petition a special session of the Virgin Islands Legislature (1) to activate a seven-person parole board in order to begin the process of reviewing prisoners eligible for parole,[4] and (2) to amend existing legislation authorizing the Attorney General to send CJC prisoners to off-island detention facilities. Similarly, the Attorney General's office would work together with the Territorial Court of the Virgin Islands to ensure that appropriate probation measures are in place to provide for review of released inmates. Finally, the Attorney General would contact the Virgin Islands National Guard to arrange for the transfer of CJC prisoners to off-island facilities in order to reduce cost and allay security concerns associated with such transfers.[5]

## B. Post-Hearing Developments

During the months following the April 1, 1997 sanctions hearing the court has maintained a close watch over the defendants' progress in following through with their proposed initiatives and the degree to which such progress has brought defendants into compliance with the terms of the Agreement. Periodic reports to

---

[4] Attorney General Brady represented that, as of April 1, 1997, approximately 20 CJC inmates had been identified as eligible for review by a parole commission.

[5] Attorney General Brady also advised the court that Governor Roy L. Schneider's overall plan to remedy the unconstitutional conditions of confinement included the construction of a new jail and the interim construction of emergency temporary shelters. The court noted, however, that the government had previously proposed as a solution the construction of a new jail but had not, to date, followed through with such a plan. More important, the court emphasized the need for immediate action, made possible by identifying short term solutions that would ultimately also contribute to the long term goals.

the court from Darlene C. Grant, Esquire, the court-appointed Special Master in this matter, reveal a series of efforts to improve conditions of confinement at the CJC. For instance, the roof is being repaired. Letter from Darlene Grant to Judge Brotman (July 7, 1997), at 3-4 [hereinafter "July 7 Letter"]. Further, the Bureau of Corrections transferred all female inmates from the CJC to the Halfway House Annex; this created an empty cluster at the CJC to help alleviate overcrowding. Letter from Darlene Grant to Judge Brotman (June 10, 1997, at 1 [hereinafter "June 10 Letter"]. At the Annex, the defendants repaired provisionally the damaged roof by patching it with two layers of tarp. *Id.* While the court acknowledges—as the defendants must also—that structural damage to the Annex's roof requires additional remedial measures, the court must also recognize the success of this short-term effort. Similarly, the court notes approvingly that the defendants have gained cooperation from the Territorial Court in placing on bail many female detainees who would otherwise be incarcerated at the CJC. *Id.*[6]

With respect to the proposed legislative measures described at the April 1, 1997 hearing, the defendants reached a significant milestone toward compliance with the Agreement when the Virgin Islands Legislature passed legislation to authorize the Attorney General to transfer inmates to detention facilities located in the mainland United States. *Id.* at 2. More important, the defendants have used the legislation as a vehicle for tangible progress in reducing the population of the CJC. On July 24, 1997, thirty inmates were transported from St. Thomas to a detention facility in Arizona.[7] Also, an additional twenty-four inmates were transferred from St. Thomas to Golden Grove, the correctional facility in

---

[6] The court also applauds the Virgin Islands Legislature's re-activation of the Parole Commission and its cooperation in helping the defendants remedy the unconstitutional conditions at the CJC. *Cf. Inmates of the Allegheny County Jail v. Wecht*, 901 F.2d 1191, 1198 (3d Cir. 1990) ("Allegheny County") (recognizing interest of local government to manage own affairs).

[7] In apparently keeping with the initiatives outlined at the April 1, 1997 sanctions hearing, Attorney General Brady enlisted the services of the United States Marshal Louie T. McKinney, the Territorial Marshal, and the National Guard to assist with and provide secure transportation of the inmates. July 24 Letter, at 1.

St. Croix, Virgin Islands.[8] As a result, the inmate population at the CJC has been reduced to 83 persons as of July 24, 1997. Letter from Darlene Grant to Judge Brotman (July 24, 1997), at 1 [hereinafter "July 24 Letter"].[9] The Agreement requires the defendants to reduce the population to 97 inmates. Thus, the defendants are in compliance with this portion of the Agreement.

As this court recognized in its previous opinion in this matter, the overcrowding at the CJC is the proverbial "bad seed" that has engendered many of the related constitutional violations. *Carty*, 957 F. Supp. at 732, 735 ("Overcrowding of inmates in correctional facilities can lead to violence among prisoners, breakdowns in classification systems, deterioration of the physical condition of the prison, and other safety hazards."). Incidents of inmate-to-inmate violence, such as the one in which inmate Oliver MacTavious was beaten into a coma by a fellow prisoner, derived directly from the overpopulation of the CJC and the defendants' failure both to segregate inmates and to monitor overcrowded cells.[10] *Carty*, 957 F. Supp. at 740. By targeting the source, the defendants have solved the immediate population problem and have also made possible their compliance with other terms of the Agreement in a more expedited fashion. For instance, the defendants can now segregate more readily according to a classification system the inmates currently housed at the CJC. *See* July 24 Letter, at 3. While the court does not suggest that the defendants have achieved compliance with the portion of the Agreement governing Corrections and Security, *see Carty*, 957 F. Supp. at 739-40 ("Prison officials must implement a classification system that separates dangerous inmates from others"); *see also id.* at 740 & nn.25-26 (noting CJC does not house inmates according to classification system), it recognizes

---

[8] Forty inmates from Golden Grove were transferred to the Arizona detention facility. This made available the bed space to house the twenty-four inmates transferred to St. Croix from St. Thomas.

[9] This figure includes seven sentenced inmates and 76 pre-trial detainees at the CJC. The Halfway House Annex houses an additional twelve inmates. Id.

[10] The court notes that MacTavious died on July 21, 1997 at the Roy L. Schneider Hospital after being in the coma he sustained at the CJC for thirteen months. Eunice Bedminster, *Inmate Who Was Beaten Dies in Coma*, The Daily News, July 29, 1997, at 3. With proper population control, segregation, and appropriate monitoring of the inmates, the defendants can ensure that similar incidents with such tragic consequences do not occur again.

220

that during recent months, the defendants have begun to implement a classification system. *See* July 7 Letter, at 3.[11] Again, the population reduction should facilitate defendants' full and forthwith compliance with corrections and security measures required by the Agreement.

Despite the defendants' achievements, persistent problems continue to plague the CJC. Inmates continue to issue complaints about medical care, nutritional value and portion size of food, and other concerns. June 10 Letter, at 2; *see also* July 7 Letter, at 2 (characterizing manner of food delivery as inhumane, unsanitary); *id.* at 3 (noting inadequate medical care and mental health services). Occasionally the physical plant fails to provide running water to cells for extended time periods. June 10 Letter, at 2. Extermination treatment and water testing still does not occur appropriately—that is, on a regular basis. July 7 Letter, at 3; *see also Carty*, 957 F. Supp. at 744. The CJC also continues to lack formal disciplinary procedures other than "lockdowns." July 7 Letter, at 2. Similarly, CJC staff do not receive sufficient training to perform their duties; as a result, low morale contributes to defendants' non-compliance with the Agreement. *Id.* at 3-4. At the Halfway House Annex, fire escapes and extinguishers are inadequate; moreover, the facility lacks a sprinkler system, smoke or fire detectors, and appropriate cell locking devices. July 24 Letter, Attachment 1, at 1. With respect to this court's previous findings concerning defendants' non-compliance with the terms of the Agreement involving religious freedom, legal access, and the Americans with Disabilities Act, there is no evidence to suggest that defendants have improved conditions of confinement in regard to these categories of the Agreement. Thus, the defendants must continue to address all of these and other deficiencies to achieve compliance with the Agreement.

█ As a final note, the court observes that a lack of funding does not serve as an acceptable excuse for defendants' non-compliance,

---

[11] The court notes that the Clerk of the Court for the District Court of the Virgin Islands has provided for the jail two computers to assist defendants in their classification efforts. Moreover, the reports generated by the Special Master can serve as a starting point—if not a blueprint—for classifying CJC inmates. Defendants thus have at their disposal everything necessary to achieve compliance with this component of the Agreement.

especially since many of the problems which the defendants face do not require inordinate financial expenditures. Providing access to religious services to honor the inmates' and detainees' right to exercise freely their religion does not cost money; it requires effort. Similarly, providing all inmates meaningful access to the outdoors and to the library and complying with the Americans with Disabilities Act should not involve significant costs. Finally, many of the problems contributing to non-compliance in the areas of "Shelter, Physical Plant, and Environmental Health" and "Fire Safety" could be solved at a low cost: Painting, cleaning, installing smoke detectors, repairing plumbing, exterminating on a regular basis, chlorinating the water—all do not impose significant financial burdens on the defendants.

## IV. Sanctions

### A. The Law—General Power, Discretion, and Limitations

■ A court has the "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Cooper v. Aaron*, 358 U.S. 1, 3 L. Ed. 2d 5, 78 S. Ct. 1401 (1958); *Shillitani v. United States*, 384 U.S. 364, 370, 16 L. Ed. 2d 622, 86 S. Ct. 1531 (1966). To that end, the law affords courts great and sound discretion in fashioning an appropriate sanction for contempt. *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir. 1994). A court uses its discretion and judgment based on its understanding of the case and the contemnor, particularly with respect to the nature of prior compliance or noncompliance. *United States v. Tennessee*, 925 F. Supp. 1292, 1303 (W.D. Tenn. 1995). The contemnor's intent to remedy the situation is relevant in gauging how severe a sanction is necessary. *United States v. United Mine Workers of America*, 330 U.S. 258, 304, 91 L. Ed. 884, 67 S. Ct. 677 (1947) ("*UMWA*").

■ The contempt power and the discretion to impose sanctions, however, have limits. Compensatory sanctions must not exceed the actual loss suffered by the party that was wronged.[12]

---

[12] Compensatory sanctions seek to compensate the complainants through the payment of money for damages caused by past acts of disobedience. *Latrobe*, 545 F.2d 1336 at 1344. A compensatory sanction must not exceed the actual damages incurred by the offended party and it must be based on evidence of a complainant's actual loss. *Gregory*, 896 F.2d

*Elkin v. Fauver*, 969 F.2d 48, 52 (3d Cir. 1992). A coercive civil sanction must employ "the least possible power adequate" to achieve future compliance.[13] *Gregory*, 896 F.2d 31 at 37 (*quoting Spallone v. United States*, 493 U.S. 265, 107 L. Ed. 2d 644, 110 S. Ct. 625 (1990)). Moreover, civil contempt sanctions should be tailored so that they do not harm unduly any broader public interests. *Elkin*, 969 F.2d at 52. In devising a remedy against governmental defendants—as in this case—the court must also take into account the interest of the state and local authorities in managing their own affairs. *Allegheny County*, 901 F.2d at 1198.[14]

■ When fashioning a sanction to secure compliance, a court considers "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *UMWA*, 330 U.S. at 304. A court should not impose sanctions that are so excessive so as to be punitive. Instead, the court should select the least intrusive sanction that the court determines will coerce the contemnor to comply. *Spallone*, 493 U.S. at 276. Determining the relative intrusiveness of different possible sanctions is a common sense inquiry. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 691, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978) (fine less intrusive than imprisonment).

---

31 at 34. Thus, for example, fines may be payable to the complainant as compensation caused by defendants' noncompliance. *Roe v. Operation Rescue*, 919 F.2d 857, 868 (3d Cir. 1990). Alternatively, the court may exercise its equitable power and order that the sanction be used to remedy the problems underlying the contempt finding. *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 92 L. Ed. 2d 344, 106 S. Ct. 3019 (1986).

[13] Coercive sanctions aid the plaintiff by bringing a defiant party into compliance with a court order; they assure that a potentially contumacious party adheres to the court order by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience. *Latrobe Steel Co. v. United Steelworkers of America*, 545 F.2d 1336, 1344 (3d Cir. 1976); *Gregory v. Depte*, 896 F.2d 31, 36 (3d Cir. 1990) (Becker, J., concurring). Coercive civil contempt sanctions are conditional sentences which permit the contemnor to relieve himself from all sanctions through compliance. *United States v. North*, 621 F.2d 1255, 1263-64 (3d Cir. 1980). Thus, the penalty is usually either (1) a jail sentence of indefinite duration, which the contemnor may avoid by agreeing to comply with the underlying order, or (2) a fine triggered by future violations of the underlying order. *Gregory*, 896 F.2d at 37.

[14] The defendants in this matter, all sued in their official capacity, are the Governor of the Virgin Islands; the Director of the Virgin Islands Bureau of Corrections; the Warden and Acting Assistant Warden of the CJC, St. Thomas, U.S.V.I.; the Attorney General of the Virgin Islands; and the Virgin Islands Bureau of Corrections.

In the context of prison litigation and corresponding consent decrees, courts have imposed substantial fines for failure to comply with orders to remedy prison overcrowding and unconstitutional conditions of confinement. *Allegheny County*, 901 F.2d at 1200 ($25,000 fine); *Morales Feliciano v. Parole Bd. of the Commonwealth of Puerto Rico*, 887 F.2d 1 (1st Cir. 1989), *cert. denied*, 494 U.S. 1046, 110 S. Ct. 1511, 108 L. Ed. 2d 646 (1990) (series of substantial monetary fines). Courts have also required the contemnor to perform affirmative acts such as early release of inmates to achieve court-ordered prison population reductions. *Essex County Jail Inmates v. Amato*, 726 F. Supp. 539 (D.N.J. 1989); *Inmates of Allegheny County Jail v. Wecht*, 573 F. Supp. 454 (W.D. Pa. 1983).

## B. Appropriate Sanction at the Present Juncture

■ The significant reduction of the CJC inmate population evidences, at long last, a genuine intent to remedy the conditions of confinement. *Cf. UMWA*, 330 U.S. at 304 (intent informs severity of sanction). Defendants' actual follow-through on several of the initiatives outlined by Attorney General Brady at the April 1, 1997 sanctions hearing as well as on-going cooperative efforts of the defendants, Special Master Grant, and outside parties such as the United States Marshals Service and the Virgin Islands National Guard suggest to the court that the defendants' remedial measures taken to date are the first of many necessary and forthcoming steps towards global compliance with the Agreement.[15]

In light of this conclusion, and cognizant of the socioeconomic and sociopolitical factors pertaining to the Virgin Islands, the court finds that monetary contempt sanctions would affect drastically the public interest and, perhaps more importantly, would impede

---

[15] Very recently, on October 27 and 28, 1997, the court inspected the CJC and Halfway House Annex. This inspection was followed by a formal hearing and an informal conference dealing with, among other things, the status of the facilities and defendants' compliance efforts. The court is greatly encouraged by what it saw and heard from the defendants, especially the information that the Virgin Islands Department of Corrections has recently hired a new director, Gerald V. Enos. His extensive background in the corrections field should provide him with the leadership skills to effect those improvements yet to be completed and bring the CJC and Halfway House Annex to the constitutional level required by the Consent Decree. The five voluminous reports prepared by the Special Master, as well as the expert reports attached thereto, should be of great assistance to him. The court urges him to review them.

progress and thwart the defendants' continuing efforts to remedy the conditions of confinement at the CJC. *Cf. Elkin*, 969 F.2d 48 at 52 (sanctions should not harm unduly public interest). Put another way, the court finds that a monetary fine would not coerce the defendants to remedy the unconstitutional conditions at the CJC. *Cf. UMWA*, 330 U.S. at 304 (court to consider probable effectiveness of sanction). Indeed, a fine would only compound the defendants' difficulties in remedying the violations and purging themselves of the contempt finding. *See also United States v. Tennessee*, 925 F. Supp. 1292, 1300 n.10 (W.D. Tenn. 1995) (noting public policy concerns and potentially counterproductive effect of fines against governmental entities and officials).

Recognizing the magnitude of defendants' recent accomplishments and the great efforts undertaken to address the matter, the court, nonetheless, is ever mindful of the tardiness of defendants' compliance efforts and the dilatory pace with which the defendants responded to court orders entered as early as October 1995. The defendants must continue to strive toward remedying the constitutional violations that were not affected—and thus not cured—by the commendable developments described above. While the court would like to bring to a conclusion this matter in which all parties—plaintiffs and defendants alike—seek to raise to a constitutional minimum the conditions of confinement at the CJC, the defendants are still a long way from reaching that point. The court notes that the citizens of the Virgin Islands "bear the human costs of operating a degraded prison system which is below minimum standards and does not afford rehabilitative opportunities for those who eventually will return to live among us," *Palmigiano v. Garrahy*, 448 F. Supp. 659, 674 (D.R.I. 1978); this cost, if unaddressed, looms as burdensome as a monetary fine that likely would be borne indirectly by the same citizens.

Finally, the court cautions that while it has determined that monetary contempt sanctions are inappropriate at this juncture, a failure to maintain the momentum generated by defendants' recent achievements—and a corresponding failure to achieve compliance with the substantive terms of the Agreement in the near future—will affect the court's response to prospective motions for relief that may be brought by the plaintiffs.

225

DATED: November 26, 1997.

## ORDER ON SANCTIONS FOR CIVIL CONTEMPT

THIS MATTER having come before the court on plaintiffs' motion to impose contempt sanctions on defendants for failure to comply with this court's orders regarding the Settlement Agreement in this matter and related orders concerning attorneys' fees;

The court having held a hearing on sanctions in St. Thomas, U.S.V.I. on April 1, 1997;

The court having inspected the CJC and Halfway House Annex on October 27, 1997;

The court having held a formal hearing on October 27, 1997 and an informal conference on October 28, 1997 where the status of the facilities and the defendants' compliance efforts were discussed;

The court having considered the submissions of the parties; and

For the reasons set forth in the court's opinion of this date;

IT IS on this 26th day of November, 1997;

ORDERED that plaintiffs' motion to impose monetary sanctions on defendants is DENIED.