ESSEX COUNTY JAIL ANNEX
INMATES, et. al.,
Plaintiffs,

v.

James TREFFINGER, County Executive,
et. al. and William H. Fauver, Commissioner, et. al., Defendants,

ESSEX COUNTY JAIL INMATES,
et. al., Plaintiffs,

v.

James TREFFINGER, County Executive,
et. al. and William H. Fauver, Commissioner, et. al., Defendants,

Nos. CIV. 87–871(HAA),
CIV. 82–1945(HAA).

United States District Court,
D. New Jersey.

Aug. 17, 1998.

---

Ivelisse Torres, Federal Public Defender's Office, Trenton, NJ, Alfred Anson Slocum, New Jersey Public Defender, Department Of Public Advocate, Trenton, NJ, for Plaintiffs.

H. Curtis Meanor, Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, PC, Newark, NJ, for Defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court on plaintiff's civil contempt motion and represents another chapter in the ongoing Essex County prison litigation. Plaintiffs now request that the court award contempt sanctions for the county's failure to comply with the most recent consent decree. The Special Masters have filed a Report and a Supplemental Report. The parties were also given an opportunity to file objections to the reports.

### I. Background

In 1982, inmates of the Essex County Jail ("ECJ") brought suit against the county alleging unconstitutional conditions of confinement. The Essex County Jail Annex ("ECJA") prison litigation followed in 1987 and the cases were eventually consolidated. Throughout the history of this litigation, the parties have resolved each of their disputes through a series of consent decrees, the most recent one being the "Second Consolidated Consent Order" ("2CCO"). The 2CCO embodies a "bona fide settlement" of the legal issues in this case. *See* Special Master Report ("Report") at 7.

The 2CCO, which incorporates all of the rights and obligations of nine other consent orders previously filed, is a lengthy document which addresses "virtually every aspect of jail administration ... from dripping faucets to population caps and medical care." *Id.* When filed, it aimed to ameliorate the deplorable conditions of confinement which existed at the time. The instant contempt application, which was originally filed in December 1993, requests that this court impose sanctions upon the county for failing to comply with several provisions of the 2CCO. This court referred the contempt application to Special Masters Bennet Zurofsky and John Degnan, that latter of whom was re-

placed by Frederic Becker on April 6, 1995. The Special Masters conducted 48 days of hearings and participated in an eight day tour of the facilities.

There does not seem to be any question that the county was in serious contempt in 1993, but several intervening developments have effected a change in climate. Initially, I note that the parties have resolved many matters by consent, e.g. the "Medical Consent Order." On other matters, while the county was recalcitrant at first, it eventually behaved more responsibly. Within the last three years, it has spent over $25 million in capital improvements and has committed itself to building a new $200 million jail. Many hope and believe that the new jail will eliminate any persisting problems. In light of these developments, the plaintiff submitted to the Special Master its "Brief to Update the Record" outlining the areas in which it believes, the county has still not complied. These specific complaints are the focus of the Special Master's Report.

According to the Special Master, the update brief makes the following complaints:

1. Staffing is inadequate and thus, inmates and staff are exposed to danger and other problems;

2. The facilities have exceeded the population caps set by the 2CCO which has resulted in overcrowding and the housing of inmates in dayrooms that has thereby endangered inmates and created unsanitary conditions;

3. The institution serves inadequate food;

4. The Fire Safety equipment and training is inadequate;

5. There is an insufficient supply of personal hygiene items;

6. There is an insufficient opportunity to shower;

7. There are continuing maintenance problems, particularly with regard to water temperature;

8. There is inadequate opportunity for recreation;

9. The prison does not provide sufficient access to telephones for legal and family calls;

10. The prison does not provide adequate visitation;

11. The prison does not provide adequate access to law libraries which are themselves inadequate.

*See* Report at 13–14.

On December 18, 1997, the Special Masters submitted to this court their report recommending that with the exception of the staffing issue, the court should dismiss plaintiff's contempt application "without prejudice to any new motions that plaintiffs may wish to file regarding current conditions." Report at 8. According to the Special Masters, the dismissal should be "premised upon Essex County's continuing commitment to complete its present projects of building completely new jail facilities and making interim repairs and improvements." *Id.*

With respect to the staffing issue, the Special Master recommends that this court order the defendants to comply with ¶ XIV of the 2CCO which would require them to commission an "independent, professional staffing analysis" addressing the areas of "staff training, staff coverage, classification, inmate activity, inmate population, and corrections operations." Additionally, the defendant must implement a plan based upon the independent analysis. *See* Report at 34–36. Finally, the Special Master recommended that the court impose a fine of $100,000, the payment of which shall be suspended. *See* Report at 36.

The approach taken by the Special Masters is somewhat unique in that they have chosen not to focus on every detail of the consent order. Rather, they acknowledge that the county is definitely not in full compliance in every area, but they are impressed by the fact that the county has made an enormous investment into improvements of current facilities and the construction of a new jail. It is the Special Master's belief that the county's laudatory efforts make contempt sanctions inappropriate. The Special Masters' report focuses upon the following twenty-five improvements:

1. Two new modular facilities have been built at the Annex, known as Satellite 6 and Satellite 6A. These facilities were completed in 1995 with a combined capacity of 116, to hold male inmates. (Estimated cost: $3,444,337).

2. A new Women's Wing has been built at the Annex, known as Satellite 7. This new building was completed in June 1996 with a capacity of 252 inmates. (Estimated cost: $15,585,745).

3. A new Processing and Visitor Reception Center has been built at the Annex, completed in June 1995. This facility improves the hospitality for inmate visitors (for example, there is now an indoor waiting room with lockers for personal belongings rather than an outdoor line awaiting admission) and facilitates several steps of the inmate admission process. (Estimated cost: $3,855,956).

4. A new "support building" was completed at the Annex in 1996, along with demolition of several decaying structures and improvements to the perimeter. The support building includes a supply warehouse so that greater stocks of clothing, hygiene items, and maintenance parts can be maintained within the institutions than had been the case in the past. The building also includes workshops for various repair and maintenance staff. This has resulted in improved maintenance at the facilities. (Estimated cost: $4,039,956).

5. A Central Intake Processing Unit was built on the first floor of the Jail in Newark to accommodate initial medical screening and examinations. (Estimated cost: $10,000).

6. The installation of two additional elevators was completed at the Jail in Newark in April of 1994. This work had been commenced pursuant to earlier consent orders but delays had plagued the project and were a part of what underlay the original contempt motion. Completion of this work has improved all prisoner movements throughout the thirteen-story structure and generally improved safety. The two original elevators have also been rehabilitated. At the time of the original motion filing the old elevators were subject to frequent failures and there had even been some injuries when elevators fell between floors. (Estimated cost: $3,808,730).

7. Satellites 1 and 2 at the Annex have been completely rehabilitated. Work was completed on Satellite 1 in October 1997 and on Satellite 2 in July 1997. Prior to rehabilitation these were two of the worst housing areas. Satellite 2 was the old Women's Wing, which we described at some length above. Satellite 1 consists of a group of modular units that were installed as a temporary measure during Peter Shapiro's administration in an effort to solve overcrowding problems. They became permanent and were used well beyond their original anticipated life. Ventilation was virtually non-existent in Satellite 1 and there was no fire-suppression or sprinkler system whatsoever. The rehabilitation brought both Satellites up to code. In addition, one of the housing pods in Satellite 1 was converted into an indoor recreation area. (Estimated cost: $4,205,386).

8. The rehabilitation of Satellites 3 and 4 at the Annex is now scheduled to be completed by June 1998. This work could not get underway before the recent completion of the Satellite 1 rehabilitation because there was no place to put the prisoners who need to be removed in order for construction to take place. Satellites 3 and 4 are trailer-like facilities originally built as a temporary measure to deal with overpopulation while satellite 5 was being constructed at the Annex during the Nicholas Amato administration. These too have become permanent and have outlived their predicted lifespan. The rehabilitation

will address fire safety, plumbing, HVAC and electric. (Estimated cost: $942,000).

9. The East Gate of the Annex is being rehabilitated and is scheduled for completion this month. This is a staging area for inmate movements in and out of the Annex. (Estimated cost: $205,639).

10. A consulting fire protection engineer has been retained. This is the County's fire safety expert who has been working with the plaintiffs' expert in designing and then supervising the installation of improved fire safety equipment and procedures throughout both institutions. (Estimated cost (annually): $52,850).

11. Smoke detectors and sprinklers have been renovated and installed throughout the Jail in a project completed in October, 1997. Previously, the smoke detectors generally did not function and many of the sprinkler installations were inadequate to cover the intended areas. (Estimated cost: $440,000).

12. Smoke barriers were built throughout the Jail in a project completed in October 1997. These are essentially solid walls that prevent smoke from migrating from tier to tier or floor to floor. In other institutions such smoke migration has been a frequent cause of serious injury. (Estimated cost: $244,743).

13. A centralized fire safety reporting center is being built at the Annex, scheduled to be completed at about the time of this writing. The Annex consists of many separate buildings. This center will provide a central monitoring location for all fire and smoke alarms and detectors throughout the facility. (Estimated cost: $10,935).

14. The County has entered into consolidated maintenance and inspection contracts with an outside contractor to insure that all fire safety systems remain operable. (Estimated cost (annual): $10,000.)

15. The Jail has contracted for a rehabilitation of its sally port, which is the primary port of entry and egress to that facility. Work is expected to be completed in the Spring of 1998. This should improve the accommodation of those who come to bail out prisoners. It does not particularly relate to any of plaintiffs' priorities, although it will be helpful. (Estimated cost: $515,000.)

16. Both institutions are in the midst of a network computer systems upgrade that is intended to link the Jail and Jail Annex computer systems into a single network and is scheduled to be completed this month. With regard to issues raised in the contempt application, it is expected that the enhanced PC network will include a terminal in each satellite of the Jail Annex that will permit legal research through the use of centralized cd roms and other means, commissary records will also be better kept and medical records will be more accessible and reliably complete when an inmate is transferred between the Jail and the Annex. If it all works, this will be a great improvement. (Estimated cost: $143,166).

17. The County has privatized its medical services, retaining Correctional Health Services, Inc. to provide it with all physicians, nurses, supervisory personnel, medical clerks, and pharmacy and lab services. The provision of this service is monitored by Dr. Ronald Shansky, who was appointed by this Court and reports on a quarterly basis. According to Dr. Shansky, medical services are greatly improved. (Estimated cost (annual): $4,600,000).

18. The County has contracted with St. Elizabeth's Hospital for a medical lock unit and specialist visits. Previously there were recurring problems finding bed space and appropriate specialists when needed for inmate

care. Estimated cost (annual): $1,000,000.

19. The County has added 77 additional corrections officers to its table of organization beyond it 1994 staffing level. The 1994 level reflected cuts in staff made by the D'Allessio administration.

20. The County advises that it has now provided Correctional Officer Training Academy training to all correctional officers who have been employed for more than one year. Previous to this motion, very few of the officers had received this training despite the fact that it is the minimum training required by State regulation. We believe the large amount of untrained staff had contributed to many problems. (Estimated cost: $268,000).

21. Exterminators have been retained for forty hours per week at the Jail and twenty hours per week at the Annex. The need was obvious. The benefits are obvious. (Estimated cost (annual): $100,000).

22. The County has implemented a so-called S.L.A.P. program, which is an early work-release program for sentenced prisoners under the supervision of the Sheriff's office. There are presently approximately 25 prisoners in this program. When fully implemented, the program should accommodate 125 prisoners. Those admitted to the program are sentenced prisoners who are released early from the Jail or the Annex to a work program. This is an alternative to incarceration of the type sought by plaintiffs.

23. The County has created an Expeditor position to help insure that prisoners are not held inappropriately. In the past, some prisoners seemed to get lost in the system and were not released although their Essex County criminal court proceedings may have permitted release. This was due to a variety of factors including holds from family court or from other jurisdictions and all sorts of bureaucratic malfunctions. The Expeditor has been in place since August of 1995 and appears to be effective with, we believe, a beneficial impact on population. (Estimated cost (annual): $35,000).

24. With the assistance of appropriate consultants, the County has written a Jail Master Plan which, among other things, attempts to predict the number and provide Constitutionally appropriate accommodation for Essex County inmates for the next 25 years. It was the development of this plan which directly led the County to conclude that it needed to construct a new jail. (Estimated cost: $202,000).

See Report at 16–24.

Finally, the Special Master looked at the County's commitment to building a new jail which is:

being designed to hold at least 2400 prisoners, and perhaps as many as 3,000. The design will be in a star pattern that will permit the addition of more wings if more space becomes necessary. We are not experts on Jail design, but we understand that the project is being designed by leading experts in the field and in accordance with current thinking on what is needed for such a facility. The County has designated a site on Doremus Avenue in Newark and it has also retained an architectural and engineering firm and a construction management firm. The County hopes to be able to open the facility in the year 2000 and has already begun to make plans for different uses of the present Jail and Jail Annex sites. Two Hundred Million Dollars of bonding has been authorized for this project through the Essex County Improvement Authority. Ground-breaking is scheduled for the spring of 1998. We believe this to be a real project which will be completed in a reasonably timely manner.

Id. at 24–5.

Until the new jail is built, a period likely to be "several years," there is no question that the plaintiff class will still be "suffering deprivations of some of the rights that they had

obtained through the consent orders." *Id.* at 16. But the underlying rationale behind the Special Master's recommendation is that the new jail:

> will eventually provide fully adequate conditions of confinement, that the closing of the present facilities upon the completion of that construction will render most of the provisions of the [2CCO] moot, and that the present conditions are being greatly ameliorated by the County's efforts.

*Id.* at 16.

As the Special Master perceives the situation, any contempt sanctions would only be counterproductive and would impede the County's efforts in building the new jail. Thereby, the prisoners would be denied the ultimate realization of better prison conditions. If this approach has any vulnerability, it is its demand that the current prisoners make some sacrifice for those of the future.

It is important to note, however, that in recommending this practical and sensible approach, the Special Masters were keenly aware that their decision did not allow any conditions that might reach unconstitutional levels to be continued. In other words, they recognized that while the prisoners might be asked to relinquish some of the benefits guaranteed by the 2CCO, their constitutional rights remain intact. Thus, it cannot be said the Special Masters have completely ignored the plight of current inmates. Had the Special Masters believed that the conditions violated the inmates' constitutional rights, I doubt that they would have made the same recommendations. The performance of the Special Masters throughout the history of this litigation confirms as much. They have never shied away from difficult decisions. Furthermore, in recommending that the court not impose sanctions, the Special Masters expressed their awareness that the defendants' commitment to invest over $250 million far exceeds any amount of sanctions requested by the plaintiff.

In response to the Special Master Report, the plaintiff initially made several objections. These objections cover the areas of:

- Overcrowding;
- Visitation;
- Showers;
- Hygiene Supplies;
- Clothing;
- Legal Access;
- Recreation;
- Implementation of Alternatives to Incarceration;
- Staffing; and
- Classification.

Upon its review of the Report and plaintiffs' objections, the court expressed concern with some of the report's shortcomings and requested that the Special Masters make supplemental findings in six areas: shower conditions, clothing, recreation, inmate classification, alternatives to incarceration, and distribution of hygiene items. The Special Masters submitted a Supplemental Report on July 21, 1998. Plaintiff filed additional objections on July 29, 1998. The supplemental findings will be considered along with the rest of the record. I will consider each of plaintiff's objections in turn.

## II. *The Contempt Power*

The court has the "inherent power to enforce compliance with its lawful orders through civil contempt." *Carty v. Schneider,* 986 F.Supp. 933, 939 (D.Vi.1997) (quoting *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958)). The power to hold one in contempt is an equitable one, the purpose of which is to make the defendant comply with an order of the court. With the instant application, the court must consider "the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947). There must be a "balancing of equities." *See Imprisoned Citizens Union v. Shapp,* 1998 WL 220957, *17 (E.D.Pa.1998). The court also acknowledges that while the instant case involves a consent decree as opposed to direct allegations of unconstitutional prison conditions, it is mindful of the deference courts have exhibited towards state corrections officials in prison litigation.

*See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (in considering whether conditions are reasonably related to a legitimate goal, Justice Rehnquist explained that courts must "heed ... [the] warning that such considerations are peculiarly within the province and professional expertise of corrections officials....")

### III. Discussion

#### A. Overcrowding

■ Almost every problem at the prison is but a symptom of the overcrowding problem. As the Special Master has noted:

When there are too many inmates all conditions of confinement deteriorate. People only sleep on floors when there are no beds; people are only housed in dayrooms when there are no more cells or dormitories available; people lose recreation opportunities when the gym is being used as a bunkhouse or there are more inmates than it is possible to accommodate; medical care is worse when the doctors and nurses have more patients than they can handle; the more a toilet is used, the more often it breaks.

Report at 25.

To ameliorate its population problem, the 2CCO sets caps for the prison. Under these caps, the ECJ may house 594 inmates and the ECJA, 909 inmates. Additionally, the order prohibits the use of dayrooms to house inmates. At the present time, there is no dispute that the prison has yet to comply with these provisions, but because the county has "embarked" upon a new program that is expected to ultimately eliminate all population problems, the Special Masters have recommended that the court not impose sanctions.

Under its new program, the county has renovated and reconstructed the ECJA's "satellites" and it will soon begin construction for its new $200 million jail. As I have already noted above, the county has added 368 beds to the prison capacity by building two new modular facilities known as Satellite 6 and Satellite 6A and a new Women's Wing known as Satellite 7. *See* Discussion, *supra*. Most importantly, once the new jail is completed in the year 2000, it will hold at least 2400 prisoners, and perhaps as many as 3,000. Without the new jail, the county will continue to exceed the population caps set by the 2CCO.

While the county may not have satisfied the population caps set by the 2CCO, sanctions are not warranted in this instance. The purpose of exercising the contempt power is to ensure compliance with an order of the court, in this case the 2CCO, and the court has "great and sound discretion in fashioning an appropriate sanction for contempt." *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir.1994). In balancing the equities, the court must consider "the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of America*, 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Moreover, while good faith is not a defense to civil contempt, it may affect the court's calculation of sanctions. *See Robin Woods, supra*, at 399; *Harley–Davidson Inc. v. Morris*, 19 F.3d 142, 148 (3d Cir.1994). Here, I do not believe that awarding monetary sanctions will serve any purpose.

The county is currently engaged in its assiduous effort to solve its inmate population problem by investing over $200 million in new facilities and improving existing ones. Because the current facilities suffer from deep-rooted infirmities due to age, size and design which will never be fully remedied, the current arrangement, by itself, will not reach the desired prison population. From that, it follows that there is no type of monetary sanctions which will coerce compliance. But while the population level fails to comply with the 2CCO, the housing situation does not impinge upon constitutional rights. Because the inmates' constitutional rights will not be jeopardized and monetary sanctions can only be counter-productive, the court will not invoke its contempt power.

My reasoning resembles that of Judge Brotman in *Carty v. Schneider*, 986 F.Supp. 933 (D.Vi.1997). In *Carty*, pretrial detainees and inmates moved for contempt sanctions against government officials for failing to

comply with a consent decree addressing conditions of confinement. Parties had entered the consent decree in October 1994. As with the instant case, the court viewed overcrowding as the "proverbial 'bad seed' that has engendered many of the related constitutional violations." *Id.* at 937. In January 1997, the *Carty* court held the defendants in contempt for not complying with the consent decree, but did not hold a hearing on sanctions until April and did not render its opinion until December 1997. By that time, the defendants had solved the "immediate population problem" addressed by the consent decree and they had begun to effect other necessary changes, but other "persistent problems" regarding medical care, nutrition, running water, regular extermination, staff training, fire prevention, and legal access continued. Nevertheless, the court declined to impose monetary sanctions. The court found that the "remedial measures taken to date [were] the first of many necessary and forthcoming steps towards global compliance with the Agreement" and it concluded that "monetary contempt sanctions would affect drastically the public interest and perhaps more importantly, would impede progress and thwart the defendants' continuing efforts to remedy the conditions of confinement." *Id.* at 940. Most importantly, the court did not rubber-stamp the defendants' efforts, but admonished them "to maintain the momentum generated by ...recent achievements" and it predicted that a "failure to achieve compliance with the substantive terms of the Agreement in the near future ... w[ould] affect the court's response to prospective motions for relief." *Id.* Similarly, the court will not order monetary sanctions here.

## B. Visitation

Additionally, now is not the time to impose sanctions for the county's failure to comply with the visitation provisions of the consent decree. Plaintiffs allege that the county has not complied with the consent decree because it only grants inmates visitation rights on Tuesday, Thursday, Saturday, and Sunday as opposed to the six days required at the ECJ and the five days required at the ECJA. *See* Plaintiffs' Opposition at 57. They further complain that the ECJ only allows noncontact visits and that when it is crowded with visitors, the jail does not provide the twenty minutes mandated by the 2CCO. *Id.* at 58–9. In their report, the Special Masters acknowledge that when these facilities are overcrowded, there are "recurring problems with visitation, the principal problem being that visitors wait too long in uncomfortable surroundings for too short a visit in an uncomfortable visitation room." Report at 41–2. But the Special Masters have noted, the county "has undertaken some construction projects designed, in part, to improve the situation for visitors, especially at the Annex where most of the prisoners are held." *Id.* Among these improvements is a new "Processing and Visitor Reception Center" at the Annex. Furthermore, the county is making more improvements and it has designed the jail to "better accommodate prisoner visits." *See Id.*

The court recognizes that the prison is not in full compliance with the 2CCO at this time, but for the same reasons that it has not imposed sanctions for overcrowding, it agrees with the Special Masters that monetary sanctions are not warranted.

## C. Showers

The 2CCO requires that the County " 'maintain all showers in working order' ... with particular requirements regarding water temperature, ventilation, prevention of mold, mildew and rust, and maintenance." *See* Supplemental Report at 2 (citing 2CCO). At the time that the plaintiffs filed this motion, the Special Masters's Report notes, the accumulation of maintenance problems— those being "scalding showers" and "epidemic leaks"—had "amounted to a serious problem that affected the habitability of many housing units." Report at 40. The plaintiffs have complained about the conditions at both the ECJA and the ECJ.

## 1. ECJA

Based upon the testimony of inmates, plaintiffs contend that there are continuing shower problems. *See* Plaintiff's Objections at 38–39. Apparently, access to showers is

limited and the showers still have temperature problems. *See* Plaintiff's Objections at 38–39. As a result, plaintiffs contend, some inmates no longer shower at the ECJA. In contrast, the Special Masters have concluded that the problems were "largely remedied" by the "complete rehabilitation of the worst areas, particularly satellites 1,2,3 and 4 at the Annex" and by "keeping . . . maintenance workers actively employed." *See* Report at 40.

Since the filing of plaintiff's objections, the County has completed the rehabilitation of Satellite 3 and is in the process of completing the rehabilitation of Satellite 4. These projects involve the "replacement of the showers where necessary and a full overhaul of the plumbing in the trailer-housing area . . . ." Supplemental Report at 3; Ex. A (copy of June 25, 1998 letter from the County to the court). The County has also committed $50,-000 to performing the same repairs throughout the ECJA and East Wing by the end of the year.[1] Finally, in a letter to the court dated June 25, 1998, the county informed the court that it was planning the rehabilitation of Satellite 5 (estimated cost of $100,000 to $140,000) and anticipated awarding the contract by July.

The court acknowledges that showers may not satisfy every inmate, but the court does not believe that sanctions are warranted. Based upon the foregoing, the county has demonstrated its dedication to eradicating these problems and there is no doubt that the county has taken its responsibilities under the 2CCO seriously. To the extent that problems remain, it is expected that they will be fully rectified once current and future projects are completed. Thus, I do not believe that monetary sanctions for the ECJA will serve any purpose at this time. The county is already spending a substantial amount of money to respond to the inmates' complaints. However, the court admonishes the county that it must not falter in its mission.

**2. ECJ**

At the ECJ, the plaintiffs complain of even greater deficiencies than those at the ECJA. According to the inmates, the showers continue to be "so scalding hot or ice cold that inmates are frequently unable to use the shower at all." Plaintiff's Objections at 38. Additionally, leaking from the ceiling of the shower areas into light fixtures exposes the prisoners to the possibility of electric shock. *See Id.* In its initial report, the Special Master made no findings regarding the conditions of the showers in the ECJ. The court was concerned with this error and asked for supplemental findings. Further investigation by the Special Masters has revealed that while the county has not been so diligent in making improvements at the ECJ, it has now begun "advertising" for construction bids to repair or replace all shower units at the jail at an estimated cost of $250,000—$500,000. *Id.* at Ex. A. It has informed the court that it will award a contract at the end of August 1998 and will require that the work be completed within 120 days. *Id.*

Furthermore, the New Jersey Department of Corrections recently inspected the ECJ and concluded that the county had complied with standards set by New Jersey regulations. This standard requires that there be "at least one operable shower with temperature controlled hot and cold water available for every 16 inmates" and that the shower shall "be accessible to inmate[s] without the necessity of leaving the immediate housing." *Id.* at Ex. B, p. 1 (copy of inspection report).

Based upon the foregoing, the court does not believe that contempt sanctions are appropriate at this time. The purpose of contempt sanctions is to compel compliance with a court order. Here, the county has committed $250,000—$500,000 to making repairs and it has complied with New Jersey's regulatory standards. The court believes and accepts the county's representation that it will award a construction contract by August 1998. The imposition of contempt sanctions would only be counterproductive.

---

1. According to the plaintiffs, as of June 9, 1998, work had not begun. However, the court has no reason to disbelieve the county's representations that it will perform the work by the end of the year.

## D. Hygiene Items

Next, the plaintiffs have objected to the Special Master's report regarding "hygiene items." Plaintiffs have focused upon the 2CCO's requirement that:

[e]ach inmate ... be issued adequate amounts of necessary personal hygiene items, including toilet paper, soap, shampoo, toothpaste, toothbrush, comb, mirror, individual razors, and shaving cream or powder.

Plaintiffs' Objections at 31.

Plaintiffs have not contested the Special Master's finding that the County has "increased its inventory of ... prisoner hygiene items," but they believe that the county has failed to properly distribute these items. *See* Plaintiff's Objections at 31. According to the plaintiffs, the ECJA no longer distributes "hygiene packages," which normally include toothpaste, toothbrush, soap, and a comb, to newly admitted inmates. *See* Plaintiffs' Response at 16. Some inmates have also complained about the county's failure to distribute toilet paper, soap, and "personal hygiene packages." *See* Plaintiff's Objections at 31–3. Inmate representatives also "report that it is 'next to impossible' for indigent inmates to receive personal hygiene items when their initial amounts of toothpaste and personal hygiene supplies run out" and generally, inmates "are unable to purchase personal hygiene supplies during the first several weeks they are in the Annex." *See* Plaintiffs' Response at 17. Female inmates have complained of the county's failure to distribute sanitary napkins.

The Special Master's initial report did not address these objections, but their supplemental report acknowledges that some problems related to distribution may still be present. Nevertheless, they do not recommend sanctions because, among other things, the New Jersey Department of Corrections has recently found that the ECJ and ECJA comply with the regulatory standard that "each inmate be provided with ... soap, toothbrush, toothpaste or powder, comb, toilet paper, shaving equipment upon request, and products for the special hygiene needs of female inmates." Supplemental Report at Ex. B, p. 7 (copy of ECJ inspection report);

Ex. C, p. 7 (copy of ECJA inspection report). This alone does not absolutely confirm the county's full compliance, but the court will nonetheless decline to order monetary sanctions. Plaintiff do not contest that there is a lack of supply and they have not alleged that the county has affirmatively refused to distribute these items. Instead the court will order the court to improve distribution within fifteen days and to submit a report to confirming that it has satisfied its obligation.

## E. Clothing Requirements

Under the 2CCO, the County must provide each inmate with "2 sets of outer garments, two sets of undergarments, and two sets of socks." *See* Plaintiff's Objections at 40. Fresh underwear is to be issued every two days. *See* Supplemental Report at 5. The plaintiffs have complained that the county has not complied with the order. *See* Plaintiff's Objections at 40. According to the plaintiffs, "[i]nmates are still only provided with one uniform and must stay in their cells all day in their underwear when their uniform is turned in for laundering." *Id.* The Special Masters' initial report made no findings on this issue. Their supplemental report remarked upon the increase in supply and that while they have "no reason to disbelieve the specifics of [the inmate complaints, they] do not believe that there is any longer a general problem in this area." Supplemental Report at 7. The Department of Corrections has concluded that the ECJ and ECJA meet their standard that all inmates be "provided with clothing that is clean, climatically suitable, durable and in good condition." *Id.* at Ex. B, p. 7 (copy of ECJ inspection report); Ex. C, p. 7 (copy of ECJA inspection report).

While the Special Masters have not conducted any "detailed study of clothing that are needed versus the supply that is on hand," (*id.* at 7), the court sees no reason to impose monetary sanctions here. In light of the findings made by the Special Masters and the Department of Corrections, the court believes that monetary would only be counterproductive. The county is well aware of its obligation under the 2CCO.

### F. Legal Access

One of the goals of the 2CCO was to improve access to legal materials. Thus, it requires that within the Annex, the county must "provide access to the law library at least 40 hours per week" and upon request, each inmate is entitled to "spend at least five two-hour periods a week in the law library." Plaintiff's Objections at 43. "If feasible, access to the law library shall be provided at the next date scheduled for law library." *Id.* Each Essex County Jail inmate is entitled to spend at least two hours a week in the law library. *Id.* at 45. With respect to the contents of its libraries, the order provides that each library shall maintain an inventory with the "full contents listed in the current edition of the New Jersey State Library's Recommended List of Books for Law Libraries in the New Jersey County Jails." *Id.* at 46. Finally, there must be "one staff person . . . minimally trained in the use of law books . . . assigned responsibility to update legal materials and assist inmates to find the material they seek." *Id.* at 50. The plaintiffs insist that the county is grossly deficient in all areas.

Regarding the degree of access to the facilities themselves, the plaintiffs claim that:

- females receive no access;
- other annex inmates must wait two weeks to a month to get to the law library and once they are allowed to go, their time is restricted to periods between fifteen minutes and an hour;
- whenever the County houses inmates in the ECJ, those inmates are not given access; and
- Juvenile inmates are also given extremely limited access to the law library.

Plaintiff's Objections at 45.

Once again, while the county may not be in full compliance, I do not believe that monetary sanctions are appropriate here. As the Special Master has noted:

> The County . . . is in the midst of completing the installation of a computer-aided legal research system which will place a terminal with access to a legal CD–Rom library in each satellite of the Annex. If this works as intended, it seems likely to meet the County's commitment. . . . [T]he new jail will be designed with adequate provision for inmate law library space and usage.

Report at 38.

The prisoner's difficulty in obtaining access to legal materials is directly related to overpopulation which, as I have already noted, the county is making every effort to correct. Thus, for reasons already stated, the court believes that at this time, sanctions would be inappropriate.

Regarding the contents of the libraries, the Special Master believes that the new computer system will remedy present concerns. However, the plaintiffs still criticize the implementation of the new system because there is only one computer at the ECJA and only the Ombudsman for the ECJA is permitted to use it. *See* Plaintiff's Objections at 49. In addition, they claim that there is no computerized research at the ECJ. Nevertheless, I believe that it makes the most sense for this court to wait until the system is fully implemented before deciding upon an award of sanctions. But I take this opportunity to admonish the defendants to be mindful of their responsibility under the 2CCO.

Finally, the inmates complain that there is no staff person to assist the inmates. As I have already noted, the consent order provides that there must be "one staff person . . . minimally trained in the use of law books" who is "assigned responsibility to update legal materials and assist inmates to find the material they seek." Plaintiff's Objections at 50. The Special Masters have not addressed this concern, but I believe that in light of my findings above, it is most prudent for the court to wait until the new system is implemented before making any determination regarding monetary sanctions. Moreover, in Section III(I) of this opinion, the court will order the county to implement a plan developed through an independent staffing analysis. *See* discussion, *infra.* This plan will address the instant legal access issue. Thus, the court will await the independent staffing analysis and the full implementation of the new system. At that time, the inmates may decide to file further motions.

*G. Recreation*

Under the consent order:

All inmates in the ECJ and ECJA shall have the opportunity to use a gymnasium or recreation outside their housing units and dayrooms for a minimum of one hour each day, seven days per week.

Plaintiff's Objections at 52 (citing 2CCO). At the time that it filed its objections to the Special Masters' report, plaintiffs identified a number of violations. *See Id.* at 52–57. According to the plaintiffs, the ECJ never provided recreation to inmates housed in dayrooms and those inmates housed on the twelfth floor. Additionally, it permitted juveniles to participate in recreation four days per week. In some instances, where the jail offers recreation to a particular floor, only half of that floor would be accommodated. At the ECJA, the county never allowed recreation to inmates housed in Satellite 2 and only limited recreation to the following inmates:

- inmates housed in Satellite 5 (one day/ week);
- inmates housed in the Main Building, Satellites 3 and 4 (five to six days / week);
- inmates housed in Satellite 4 (everyday but Friday);
- inmates housed in Satellite 1 (Monday through Friday);

The Special Master made no findings on this issue in its initial report, an oversight which troubled the court and created the need for a supplemental report. From the Special Masters' supplemental report, it now appears that the county has made recreation substantially more accessible to the inmates.

In April 1998, an inspection performed by the New Jersey Department of Corrections confirmed that the ECJ provides inmates with the "opportunity to participate in a minimum of one hour of physical exercise and recreation each day outside the living unit." *See* Supplemental Report at Ex. B. at p. 38. The May 1998 inspection of the ECJA concluded that the ECJA had not fully complied because some satellites only provided five days of recreation. *Id.* at Ex. C. Notwithstanding the failure to provide access to re-

creation seven days per week, the inspection findings reflect a marked improvement over the conditions alleged by plaintiffs in their objections to the Special Master report. For instance, one can no longer argue that the county completely denies recreation to Satellite 2 inmates or commits some similar abuse.

This progress is further evidenced by several improvements to facilities since the plaintiffs filed their objections. The county has "expanded and improved" Satellite 2's indoor and outdoor recreation areas. Specifically, the defendant maintain that the new outdoor recreation facility has:

four half-court basketball courts and space for outdoor recreation. The indoor recreation area has been enlarged and includes weight lifting equipment, pool and ping-pong tables, punching and speed bags and space for passive indoor recreation.

*Id.* at Ex. A (copy of county's June 25, 1998 letter).

Additionally, Satellites 3,4, and 5 are in various states of rehabilitation. *See* discussion, *supra* at 15–16.

Notwithstanding these improvements, plaintiffs still argue that the defendants are not in compliance with the 2CCO. In their response to the Special Masters' report, the plaintiffs have submitted a copy of the May 1998 log sheets for the "up and down gyms" at the ECJ. *See* Plaintiff's Response at 13; Ex. P–1. The logs indicate that inmates in protective custody and inmates on the 12th floor did not use the gym in May 1998. *See Id.* Additionally, as the plaintiff has noted, "inmates on other floors" did not use the gym "often." *Id.* Plaintiffs claim that this means that inmates were denied access to recreation. However, that is not necessarily the case. At most, what the report shows is that certain inmates did not use the gym at the ECJ during the month of May. However, in light of the findings by the New Jersey Department of Corrections that the ECJ provides inmates with the "opportunity to participate in a minimum of one hour of physical exercise and recreation each day outside the living unit," the court will not find that the ECJ recreation program violates the 2CCO.

As with the ECJ, plaintiffs still maintain that the ECJA has not complied with the ECJA. According to the plaintiffs, inmates representatives have stated that the ECJA continues to provide limited recreation opportunities to the following inmates:

- two hundred of the inmates in Satellite 2 (no recreation on weekdays);
- inmates from the East and West Wing of the Main Building (no recreation on the weekends);
- Satellite 5 inmates (no recreation on Saturdays).

*See* Plaintiffs' Response at 14.

With the exception of the plaintiff's complaints regarding Satellite 2, plaintiff's findings are consistent with those of the New Jersey Department of Corrections that ECJA only provides five days of recreation to some inmates at the ECJA. With respect to Satellite 2, the court finds it difficult to believe plaintiff's claims in light of the Department of Corrections inspection and the recent expansions and improvement of Satellite 2's indoor and outdoor recreation areas. *See* discussion, *supra.* Perhaps there are instances where the level of access falls below that found by the inspector, but for the most part, the court believes that the Department of Corrections' findings accurately characterize the prison conditions.

The Special Masters believe that recreation is directly related to the problems of overpopulation and staffing. Certainly, overcrowding impedes the county's ability to provide recreation opportunities and for that reason, it would be consistent with this opinion for the court to excuse full compliance. *See* discussion, *supra.* That does not mean that the court will ignore the recreation problem and permit the county to abandon the 2CCO. If the conditions were the same as those described by the plaintiffs in their objections, monetary sanctions might be appropriate, but here, they are unwarranted.

In the instant case, the county is approaching full compliance and is making efforts to ultimately satisfy the inmate's recreation needs. At worst, some inmates are only provided five days of recreation. Ultimately, with improvements at the current site and the construction of the new jail, it is expected that there will be more than sufficient recreation opportunities for all inmates. Additionally, to the extent that staffing inefficiencies contribute to the lack of recreation opportunity, in Section III(I) of this opinion, the court will order that the county implement a plan developed through an independent staffing analysis. *See* discussion, *infra.* This analysis will cover "inmate activities," a term which includes recreation. For the reasons already stated, the court finds that additional sanctions would be counterproductive and unnecessary.

## H. The Implementation of Incarceration Alternatives

To alleviate overcrowding, the consent decree mandates that the county investigate and adopt alternatives to incarceration. Plaintiffs now argue that the county has violated the consent decree by first, not establishing a "substance abuse program, Turning Point/Second Chance, for pre-trial incarcerated persons detainees at the ECJ and ECJA" and second, by not implementing the "Sentencing Projects' recommendations on incarceration alternatives 'to the fullest extent necessary to bring the ECJ and the ECJA population below the caps specified by [the 2CCO.]'" *See* Plaintiff's Objections at 60–61. Additionally, plaintiffs complain that the county has failed to submit "a report to the Special Masters and plaintiffs on the status of the Intensive Supervision Probation program and the County's Community Program." *Id.*

On this issue, the Special Master concedes that the requirements of the 2CCO are not being met. *See* Special Masters' Supplemental Report at 13. In the past, the county operated many alternative programs, but currently is only involved in a program called "Second Choice," formerly known as S.L.A.P. S.L.A.P. is:

an early work-release program for sentenced prisoners under the supervision of the Sheriff's office. There are presently approximately 25 prisoners in this program. When fully implemented, the program should accommodate 125 prisoners. Those admitted to the program are sen-

tenced prisoners who are released early from the Jail or the Annex to a work program. This is an alternative to incarceration of the type sought by plaintiffs. Report at 23.

According to the Special Masters, the county's position is that "it is unwilling, for reasons of public safety and *realpolitik*, to make more vigorous use of non-custodial programs." Supplemental Report at 14. Notwithstanding the county's refusal to operate these programs, the Special Master have not recommended that the court impose sanctions because for the reasons related to the underlying theme of its report on the issue of overcrowding,

> the county's commitment to a new jail changes the previously contemptuous nature of the county's conduct regarding alternatives to incarceration.... Habitable conditions of confinement are certainly required, but equity does not require that alternatives to incarceration, as opposed to new construction, be employed as the means of permanently achieving that necessary goal.
>
> Supplemental Report at 15.

For the most part, the court adopts the position taken by the Special Masters. Through a number of efforts which mostly include construction and rehabilitation of facilities, but also involve the operation of "Second Choice," the county is employing methods to reduce overcrowding. It is anticipated that through the county's impressive efforts, the new jail will eliminate overcrowding. The court is loath to either impose its own notions of enlightened policy upon the county like a "roving commission" or to unnecessarily usurp the authority of the county. *See Union County Jail Inmates v. Di Buono,* 713 F.2d 984 (3d Cir.1983). With that in mind, the court finds that it make no sense to purposefully thwart the county's initiative.

## I. Staffing and Classification

### a. Staffing

 Amongst all of the county's transgressions alleged by the plaintiff, the Special Masters expressed the most concern over staffing. When a prison is confronted with the dual problem of overcrowding and inade-

quate staffing, the Special Master believes, this "creates many dangers to both inmates and the staff" such as "intra-inmate violence, sex or intimidation, failures to observe prisoners who are ill or in distress so that appropriate medical attention can be obtained in a timely manner, and increased danger of violence directed at the corrections officers." Report at 32. Unquestionably, inadequate staffing of prisons may cause harm that reaches constitutional proportions. For that reason, the Special Master recommended that the court order the defendant to:

> obtain and submit to plaintiffs' counsel an independent, professional staffing analysis for three areas of [prison] operations: security staffing and training, classification, and inmate activities.
>
> Report at 34–36.

This analysis:

> shall address staff training, staff coverage, classification, inmate activity, intake population, and corrections operations. The staffing analysis shall review current authorized staffing, vacancies, position descriptions, salaries, classification, and workload. The analysis shall try to maximize the use of properly classified and trained inmate workers where appropriate. The analysis shall take into account the requirements of this Agreement with respect to health, safety, and food service as it impacts on the work of corrections or civilian staff.
>
> *Id.*

The Special Masters also recommended that the defendants be ordered to "implement the plan." *See* Report at 34–36. Finally, the Special Master has recommended that the

> court impose a fine of $100,000, but that the collection of the fine should be suspended until June 30, 1998, and that if the County demonstrates that it has retained the necessary expert by that date and has the study underway that it be further suspended for a reasonable time to permit completion of the study. Upon full compliance with the requirements, [the Special Master] recommend[ed] that the fine be forgiven.
>
> Report at 36.

Plaintiffs' only objection to this recommendation is that it believes that the recommendation does not compel the county to implement the independent plan. However, that impression is mistaken because as the foregoing indicates, the Special Master did indeed recommend that the court order such a requirement. Thus, I will adopt the Special Master's recommendation with one exception. I will suspend the collection of the fine until October 31, 1998.[2]

#### b. Classification

■ In their objections, the plaintiffs have complained that the Special Master has not addressed the classification issue. Plaintiffs devote seventeen pages to the county's failure to adopt the classification provisions required by the 2CCO. According to the plaintiff, defendants have not complied with the consent decree by:

- failing to classify and house inmates in general population and special use housing;
- failing to separate violent inmates from vulnerable inmates;
- failing to separately house sex offenders and inmates with mental health problems apart from other inmates;
- failing to establish a separate housing area for the intake and reception of inmates;
- failing to separately house newly admitted inmates until the inmates are medically cleared;
- improperly using detention cells to house inmates in need of medical attention or inmates in need of psychiatric observation;
- failing to maintain a special needs housing unit for inmates in need of observation or close custody, e.g. suicidal inmates.

See Plaintiff's Objections at 8–25.

Plaintiffs allege that these classification problems are "extremely dangerous" and may infringe upon the Eight Amendment right to

be free of cruel and unusual punishment. See Id. at 21 (citing *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In its initial report, the Special Masters' treatment of the classification issue was scant. It now appears that the county is implementing a plan known as the "County Correctional Information System Objective Jail Classification System." See Supplemental Report at 12. Apparently, the New Jersey Correctional Authorities modeled this system after one developed by the National Institute of Corrections. See Id. The system will:

> standardize the classification of both pretrial and sentenced inmates and will allow jail administrators of participating counties to take maximum advantage of secure bedspace and program slots by quickly identifying those offenders best suited for the appropriate security level. Through the use of a standardized and uniform scoring and evaluation process among all the counties, offenders transferred from one jail to another will have the same date collected, with the same definitions, which will facilitate the identification intake and assignment process at the receiving jail.
>
> Id. at Ex. E (copy of letter from County Counsel to plaintiff and Special Masters).

The county claims that it has begun operating the program at the ECJ and intends on implementing the program systemwide, including the ECJ, by January 1, 1999. However, the plaintiffs are still not satisfied.

Plaintiffs complain that the Special Masters have not indicated how the new plan will house inmates and thus, they have renewed the objections raised previously. See discussion, *supra.* Essentially, they maintain that the inmates remain in "grave danger" because the new plan does not provide for separate housing of the different types of inmates. For example, by not separating newly admitted inmates, disciplinary detention inmates, protective custody inmates,

---

**2.** In a recent letter, the plaintiffs have complained that the county has yet to submit a staffing analysis and therefore, have not complied with the Special Master's June 30, 1998 dateline.

Because I have now ordered the defendants to comply with its order by October 31, 1998, plaintiff's point is moot.

mentally ill inmates, and medically needy inmates as required by the 2CCO, the county has permitted a dangerous mix of inmates. Plaintiffs cite several violations of the 2CCO. This includes the allegation that the county has not complied with state regulations regarding classification and housing of inmates. *See* Plaintiff's Response at 9.

The plaintiffs' allegations are seriousness enough to warrant contempt sanctions. Nevertheless, sanctions are not appropriate yet. In Section III(I) of this opinion, the court has ordered an independent staffing analysis to be conducted which will address "staff training, staff coverage, *classification*, inmate activity, intake population, and corrections operations." *See*, Discussion, *supra* at 25–27 (emphasis added). This independent analysis must include practices for classifying and housing inmates throughout the prison system. For that reason, the court believes it most prudent to wait until the independent analysis is performed before it decides whether to impose contempt sanctions.

The inmates have raised some genuine concerns regarding the housing of inmates under the new classification system which the Special Masters have not addressed. The court cannot ignore its obligation to ensure compliance with the 2CCO, but it will await the release of the independent staffing analysis. However, it will order that the independent staffing analysis include an evaluation of the county's "County Correctional Information System Objective Jail Classification System." Until an independent analysis is conducted which either approves or disapproves of the classification plan, the court need not consider whether the plan satisfies the 2CCO.

*IV. The Impact of the PLRA upon Plaintiff's Contempt Application*

■ In adopting the Special Master's recommendation and enforcing the 2CCO, the court is mindful of the fact that through the Prison Litigation Reform Act ("PLRA"), Congress has effected a revolution in prison litigation. *See* 18 U.S.C. § 3626. Congress has expressed its desire to "end perceived ongoing micromanagement of state and local prisons systems by federal courts." *See*

*Taylor v. United States*, 143 F.3d 1178, 1998 WL 214578, *3 (9th Cir.1998). Thus, while the court finds that the PLRA does not affect the instant contempt application, some explanation is necessary.

Section 3626(a) of the PLRA provides:

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626(a).

The most controversial section of the PLRA, § 3626(b), entitles "any party or intervener" in this type of prison litigation to seek immediate termination of any "prospective relief" which has been previously ordered. The section applies to those orders entered before the enactment of the PLRA. However, such prospective relief:

shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

*Id.*

The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages." *Id.* at § 3626(g)(7). Relief means "all relief in any form that my be granted or approved by the court, and includes consent decrees ...." *Id.* at § 3626(g)(9).

Most courts have construed 3626(b) to mean that once the defendants, plaintiffs, or intervenor shows their entitlement to terminate prospective relief under the act, the court must terminate the actual consent decree which has been previously entered. *See Taylor, supra; but see, Benjamin v. Jacob-*

*son,* 124 F.3d 162, 167 (2d Cir.1997) (act terminates jurisdiction to enforce past consent decree, but not decree itself). Section 3626(b) may potentially have a dramatic impact upon prison litigation because it will allow prisons to evade terms of the consent decrees which were entered prior to the PLRA. Before the enactment of the PLRA, courts permitted parties to settle disputes over constitutional violations by entering into consent decrees that imposed requirements exceeding constitutional levels. *See Rufo v. Inmates of Suffolk County,* 502 U.S. 367, 389, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ("almost any affirmative decree beyond a directive to obey the Constitution necessarily" exceeds what is compelled by the Constitution); *Kindred v. Duckworth,* 9 F.3d 638, 641 (7th Cir.1993) (consent decrees often embody outcomes that reach beyond basic constitutional protections). That is what occurred here and in numerous other prison litigations.

Through the PLRA, Congress now prohibits parties from entering enforceable consent decrees which exceed constitutional requirements. The impact of the PLRA is magnified by the fact that, upon a motion by any of the parties, the court may terminate consent decrees similar to that in the instant case. That is a marked change. However, in the instant case, neither a party nor an intervenor has moved to terminate the underlying consent decree and thus, the court need not apply § 3626(b).[3]

■ While 3626(b) does not apply here, one might argue, albeit incorrectly, that § 3626(a) limits the court's ability to enforce the 2CCO. This court does not share that view because the court's inherent contempt power remains unaffected by § 3626(a). The enforcement of a valid consent decree is not the kind of "prospective relief" considered by § 3626(a). As long as the underlying consent order remains valid—neither party has made a 3626(b) motion to terminate—the court must be able to enforce it. *See Komyatti v. Bayh,* 96 F.3d 955 (7th Cir.1996). The court draws some support for this position from *Carty v. Farrelly,* 957 F.Supp. 727 (D.V.I.1997).

Notwithstanding the PLRA, the district court in *Carty* held the defendant in contempt of the consent decree. The defendants had initially moved to terminate the consent decree, but then withdrew the motion. Because § 3626(b) had not been invoked, the court did not need to consider the validity of the underlying consent decree. The court then went ahead and ruled upon the contempt application. While the court does not specifically mention § 3626(a), there is no question that it was well aware of the statute's existence. *Carty* implicitly held that the PLRA did not limit its ability to exercise its contempt power. Similarly, I do not believe that this action constitutes "prospective relief" because it does nothing more than enforce the provision of a prior order of this court which remains valid.

That § 3626(a) has no application here is further confirmed by an examination of the act itself. If § 3626(a) rendered an underlying consent decree unenforceable, that would make § 3626(b) superfluous. If a court interpreted § 3626(a) as effectively limiting a previously entered consent decree, there would be no need for a party to file a motion to terminate under § 3626(b). Because the Third Circuit has commanded that lower courts interpret statutes to "avoid a construction of a statute that renders any provi-

**3.** It is worth noting that there have been several challenges to the validity § 3626(b) arguing that it violates the separation of powers doctrine. The majority of circuits have held it to be constitutional. *See Hadix v. Johnson,* 133 F.3d 940, 942 (6th Cir .1998); *Dougan v. Singletary,* 129 F.3d 1424, 1426 (11th Cir.1997); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 657 (1st Cir.1997); *Gavin v. Branstad,* 122 F.3d 1081, 1088–89 (8th Cir.1997); *Plyler v. Moore,* 100 F.3d 365, 371–73 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997); *Benjamin, supra,* at 173 (Section 3626(b)(2) is constitutional but does not terminate decree; only jurisdiction of federal court terminated). Only the Ninth Circuit has found that § 3626(b) violates the separation of powers doctrine. *See Taylor, supra.* The Third Circuit has not addressed this issue, but the district courts have split on this issue. *See Imprisoned Citizens Union v. Shapp,* 1998 WL 220957 (E.D.Pa.1998) (finding § 3626 to be constitutional); *Denike v. Fauver,* 3 F.Supp.2d 540 (D.N.J. 1998) (finding § 3626 unconstitutional under the separation of powers doctrine).

sion superfluous," I find 3626(a) inapplicable here. *See United States v. Higgins*, 128 F.3d 138, 141 (3d Cir.1997); *Pennsylvania Department of Public Welfare v. United States Department of Health and Human Services*, 928 F.2d 1378, 1385 (3d Cir.1991).

*V. Plaintiff's Recent Letter*

In their July 21, 1998 letter, the plaintiff alleges other areas of noncompliance. Specifically, plaintiffs contend that:

1. inmates do not receive regular fire drills;

2. some female inmates must sleep on the floor;

3. the county continues to house inmates in the dayrooms;

4. many inmates do not receives towels or sheets;

5. inmates are provided with only one blanket;

6. inmates are not provided with pillows or pillow cases;

7. inmates have only one uniform and are not provided with undergarments or socks;

8. inmates do not receive adequate amounts of toilet paper;

9. female inmates do not receive adequate amounts of sanitary napkins;

10. newly-admitted and indigent inmates are unable to get personal hygiene supplies;

11. inmates in the ECJ and ECJA do not receive visitation on the requisite number of days;

12. food sometimes runs out, and food portions are too small;

13. shower temperatures at the ECJ are often scalding hot or freezing cold;

14. inmates are not given adequate amounts of cleaning supplies;

15. inmates on the third and 8/9 floor of the ECJ do not receive any dayroom time.

Some of these items have already been addressed. *See* discussion, *supra*, (covering items 3,7,8,9,10,11,13). The other items were not addressed in the plaintiffs's objections to the Special Master.[4] To the extent that plaintiffs have now raised issues which were not addressed in their objections, it is not appropriate for the court to consider them at this time. Plaintiffs should have made these objections previously.

*VI. Conclusion*

For reasons detailed above, the court orders the following:

1. plaintiff's request for monetary contempt sanctions is partially DENIED;

2. defendants:

 a. must obtain and submit to plaintiffs' counsel an independent, professional staffing analysis for three areas of [prison] operations: security staffing and training, classification, and inmate activities;

 b. the analysis shall address staff training, staff coverage, classification, inmate activity, intake population, and corrections operations. The staffing analysis shall review current authorized staffing, vacancies, position descriptions, salaries, classification, and workload. The analysis shall try to maximize the use of properly classified and trained inmate workers where appropriate. The analysis shall take into account the requirements of this Agreement with respect to health, safety, and food service as it impacts on the work of corrections or civilian staff;

 c. the analysis should also evaluate the "County Correctional Information System Objective Jail Classification System;"

 d. must implement the plan;

 e. shall be fined $100,000, but the court will suspend the collection of the fine until October 31,1998; and if the County demonstrates that it has retained

4. In their objections to the Special Masters' Report, plaintiffs covered nine areas: classification, staffing, hygiene items, showers, clothing requirements, legal access, recreation, visitation, alternatives to incarceration.

the necessary expert by that date and has the study underway, the fine will be further suspended for a reasonable time to permit completion of the study; upon full compliance with the requirements, the fine will be forgiven;

3. defendant must comply with 2CCO's terms regarding hygiene items such that each inmate should be issued adequate amounts of necessary personal hygiene items, including toilet paper, soap, shampoo, toothpaste, toothbrush, comb, mirror, individual razors, and shaving cream or powder;

4. defendants shall submit a report within 15 days confirming that they have satisfied their obligations regarding the distribution of hygiene items.